RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JEFFREY CAMPBELL (23-5298); MARK DYER (23-5311),
*Defendants-Appellants*.

┐
│
│
│
> Nos. 23-5298/5311
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:17-cr-00087-1—Rebecca Grady Jennings, District Judge.

Argued: October 30, 2024

Decided and Filed: April 3, 2025

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Ronald W. Chapman, II, CHAPMAN LAW GROUP, Troy, Michigan, for Jeffrey Campbell. Achal J. Fernando-Peiris, Melissa M. Salinas, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, for Mark Dyer. Sofia M. Vickery, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Ronald W. Chapman, II, CHAPMAN LAW GROUP, Troy, Michigan, for Jeffrey Campbell. Achal J. Fernando-Peiris, Melissa M. Salinas, Matthew G. Rice, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, for Mark Dyer. Sofia M. Vickery, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

HELENE N. WHITE, Circuit Judge.  Defendants-Appellants Jeffrey Campbell and Mark Dyer appeal their convictions and sentences for conspiracy to unlawfully distribute controlled substances, conspiracy to commit health-care fraud, health-care fraud, and money laundering, challenging the jury instructions, sufficiency of the evidence, and the district court's evidentiary rulings.  Finding no error, we AFFIRM.

## I.  Background

Campbell was the owner and lead doctor at a primary-care facility called Physicians Primary Care (PPC).  Dyer was a nurse practitioner at PPC.  A grand jury indicted them in 2020 on nine counts alleging Campbell and Dyer overprescribed opioids to their patients, and fifteen counts alleging they engaged in a scheme to seek fraudulent reimbursements from health-insurance providers.

For the alleged overprescribing, the grand jury charged Campbell with four counts and Dyer with six counts of unlawfully distributing controlled substances; both Defendants with one count of conspiring to unlawfully distribute controlled substances; Campbell with one count of dispensing controlled substances resulting in death; and both Defendants with one count of conspiring to dispense controlled substances resulting in death.  Regarding the alleged insurance-fraud scheme, the indictment alleged that Campbell and Dyer sought to obtain fraudulent reimbursements from insurance companies for certain exercise, counseling, and physical-therapy services that PPC provided.  It also alleged that Campbell used the insurance proceeds to pay substantial bonuses to Dyer and other PPC employees, which further incentivized those employees to continue to fraudulently bill and order other medically unnecessary tests.  For this conduct, the grand jury charged Campbell with thirteen counts and Dyer with one count of health-care fraud under 18 U.S.C. § 1347; both Defendants with one count of conspiring to commit health-care fraud under 18 U.S.C. § 1349; and both Defendants with one count of money laundering under 18 U.S.C. § 1956.

The case proceeded to trial and the jury found Campbell guilty on one count of conspiring to unlawfully distribute controlled substances, ten counts of health-care fraud and one count of conspiracy to do the same, and one count of money laundering, and found him not guilty on four counts of unlawful distribution, one count of dispensing controlled substances resulting in death and one count of conspiracy to do the same, and one count of health-care fraud. The jury found Dyer guilty on one count of conspiring to unlawfully distribute controlled substances, one count of health-care fraud and one count of conspiracy to commit the same, and one count of money laundering, and found him not guilty on six counts of unlawfully distributing controlled substances, and one count of conspiracy to distribute controlled substances resulting in death.

The district court sentenced Campbell to 105 months of imprisonment followed by three years of supervised release, and Dyer to sixty months of imprisonment followed by three years of supervised release. After Defendants appealed, the district court ordered Campbell to pay $841,395.52 in restitution and Dyer to pay $105,085 in restitution.

## II. Analysis

### A. Jury Instructions Issues

Defendants were convicted under 21 U.S.C. § 846, which makes it a crime to conspire to violate a drug law, specifically 21 U.S.C. § 841. Section 841 bars a defendant from "knowingly or intentionally" distributing controlled substances "[e]xcept as authorized." 21 U.S.C. § 841(a)(1). The regulation implementing this provision states that a medical practitioner is authorized to distribute controlled substances when he does so "for a legitimate medical purpose . . . acting in the usual course of his professional practice." 21 C.F.R. § 1306.04.

After Defendants' convictions, the Supreme Court decided *Ruan v. United States*, 597 U.S. 450 (2022). The Court held that "the statute's 'knowingly or intentionally' *mens rea* applies to authorization." 597 U.S. at 454. In other words, a defendant unlawfully distributes controlled substances only where he *knows* that he is "acting in an unauthorized manner, or intend[s] to do so." *Id.* Thus, liability cannot turn on "the mental state of a hypothetical 'reasonable' doctor." *Id.* at 465. Rather, to obtain a conviction, the government must prove that

the "defendant himself" subjectively knew that his acts were without a legitimate medical purpose in the usual course of his professional practice. *Id.* at 465–67.

Defendants argue that the district court did not instruct the jury on the mens rea *Ruan* requires.[1]  Although the trial here occurred before *Ruan*, this court measures jury instructions against the law at "the time of appellate consideration." *United States v. Houston*, 792 F.3d 663, 667 (6th Cir. 2015).  *Ruan* involved doctors who were convicted of unlawful distribution under § 841—not conspiring to unlawfully distribute under § 846, as Campbell and Dyer were.  But the Supreme Court's reading of the statute still affects what the government must prove to properly convict Campbell and Dyer under § 846.  Indeed, to prove a conspiracy to unlawfully distribute, the government must prove beyond a reasonable doubt that the defendant "knowingly and voluntarily joined" an "agreement" to violate Section 841. *See, e.g.*, *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019).  And after *Ruan*, a person cannot "knowingly" agree to violate § 841 unless he agrees to commit acts he *knows* are unauthorized.  597 U.S. at 454.  Thus, the government cannot prove a § 846 violation unless it proves that the conspirators in the agreement knew they were acting—or intended to act—without a legitimate medical purpose in the usual course of professional practice.

As an initial matter, the parties dispute the standard of review.  "Harmless-error review applies when the defendant preserves the objection [to jury instructions] at trial, and plain-error review applies when he does not." *Houston*, 792 F.3d at 666.  We need not resolve that dispute because, although Defendants have a strong argument that the jury instructions did not comply with *Ruan*, this court's precedents compel us to hold that no reversible error occurred under either standard of review.

Nowhere do the jury instructions on the unlawful distribution and conspiracy to unlawfully distribute counts clearly state that the government must prove that Defendants knew they were "acting in an unauthorized manner, or intended to do so." *Ruan*, 597 U.S. at 454.  In

---

[1]Dyer raised this argument in his opening brief.  Campbell adopted this argument in his Rule 28(i) letter. *See* F.R.A.P. 28(i) ("In a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief.").  The government does not dispute that Campbell properly raised this argument through adoption.

explaining the "agreement" the jury must find to convict on the conspiracy count, the district court stated that "[a] defendant ordinarily commits" a § 841 violation "when he knowingly, intentionally, and unlawfully distributes or dispenses controlled substances and he knows the substances are controlled substances." R. 507, PID 11034. Defendants rightly assert that these instructions do not explain that the conspirators in an unlawful distribution agreement must know their actions were unauthorized, an element that is especially important where the defendants are health-care professionals. Rather, the district court told the jury a defendant must know only two things: (1) that he is "distributing" substances, and (2) that "the substances are controlled." *Id.* The government notes the district court later instructed the jury that medical professionals "must not distribute and dispense controlled substances without a legitimate medical purpose or outside the usual course of medical practice." *Id.* But that admonition does not fix the problem because it still does not instruct the jury that a conspirator must subjectively *know* he lacks authorization.

The closest the district court came to discussing knowledge of a lack of authorization was in its deliberate-ignorance instruction. There, the district court told the jury:

> If you are convinced that the defendant deliberately ignored a high probability that the controlled substances were being dispensed or distributed outside the course of professional practice and not for a legitimate medical purpose or that patients were diverting these controlled substances for illegal purposes, then you may find that he [] knew this was the case. . . . Carelessness or negligence or foolishness on [the defendants'] part is not the same as knowledge and is not enough to convict.

*Id.* at PID 11028–29. This instruction states that the jury can infer knowledge from deliberate ignorance. But it still does not state that knowledge of a lack of authorization is a required element of the offense itself. And the court's instructions on the elements of unlawful distribution pointedly omit any reference to knowledge of a lack of authorization. Simply put, the district court never instructed the jury that it could convict Defendants only if it found that they "knew or intended that [their] . . . conduct was unauthorized." *Ruan*, 597 U.S. at 467. So it is doubtful that these instructions conveyed the mens rea *Ruan* requires for distribution.

We do not, however, write on a clean slate. Since *Ruan*, this court has issued a trio of opinions involving jury instructions nearly identical to those in this case. *See United States v.*

*Anderson*, 67 F.4th 755 (6th Cir. 2023); *United States v. Bauer*, 82 F.4th 522 (6th Cir. 2023); and *United States v. Stanton*, 103 F.4th 1204 (6th Cir. 2024).  Those precedents require us to affirm.

First, in *Anderson*, this court held that a similar deliberate-ignorance instruction was sufficient to satisfy *Ruan*'s requirements.  67 F.4th at 766.  There, a doctor was convicted of unlawful distribution under § 841.  *Id.*  The district court's instructions on the substantive elements of the offense did not state that the government had to prove the defendant knew he lacked authorization.  *Id.*  But the district court also instructed that if "the defendant deliberately ignored a high probability that the controlled substance was distributed or dispensed without a legitimate medical purpose in the usual course of professional practice," the jury could "find that the defendant knew this was the case."  *Id.*  And just as here, the district court explained that "[c]arelessness, or negligence, or foolishness . . . are not the same as knowledge."  *Id.*  We held that the deliberate-ignorance instruction "substantially cover[ed]" *Ruan*'s requirements "through the description of deliberate ignorance and the juxtaposition of 'knowledge' with '[c]arelessness, negligence, or foolishness.'"  *Id.*

Next, in *Bauer*, a doctor convicted of unlawful distribution under § 841 argued that *Ruan* required reversal because the district court did not specifically instruct the jury that to be found guilty, the defendant must know he lacked authorization.  82 F.4th at 530.  But the *Bauer* jury received "the same deliberate ignorance instruction" as in *Anderson*.  *Id.* at 532.  Conducting plain-error review, the *Bauer* court noted that "the instructions in *Anderson*—and thus here as well—do not fully comport with *Ruan*" because the jury was not "properly instructed to focus on [the defendant's] subjective knowledge and intent" to act without authorization.  *Id.* at 533.  But the court affirmed because "*Anderson* controls and requires that we find the jury instructions adequate."  *Id.* at 533.

And finally, *Stanton* applied these holdings to an appeal challenging a conviction for conspiracy to unlawfully distribute under § 846.  103 F.4th at 1209.  There, the district court instructed the jury on deliberate ignorance, but the defendant argued on appeal that "the instruction fail[ed] to follow *Ruan*."  *Id.* at 1213.  Citing *Anderson*, we held that "[a] deliberate ignorance instruction satisfies *Ruan* when, as here, it reminds the jury that this standard sits well above carelessness, negligence, and mistake."  *Id.*

Thus, this court has consistently held that *Ruan* is satisfied where the district court provides a deliberate-ignorance instruction like the one here. Those holdings bind us. So although "the instructions in *Anderson*—and thus here as well—do not fully comport with *Ruan*," we nonetheless conclude that *Anderson* and its progeny "require[] that we find the jury instructions adequate." *Bauer*, 82 F.4th at 533.**[2]**

 Defendants' attempts to distinguish this court's precedents are unpersuasive.

First, Dyer asserts that the district court instructed the jury that it could convict only if it found that Defendants acted "knowingly and intentionally, and not in good faith." Dyer Brief at 23–24 (quoting R. 507, PID 11038). And the district court explained that "good faith" "means that the defendant acted in accordance with what he reasonably believed to be proper medical practice." R. 507, PID 11049. Dyer notes that *Ruan* rejected a similar instruction: There, the government sought to have the district court instruct the jury that a defendant lacked knowledge when he put forth an "objectively reasonable good-faith effort." *Ruan*, 597 U.S. at 452. The Court rejected that instruction because an objectively-reasonable-good-faith standard "would turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, rather than on the mental state of the defendant himself." *Id.* But Dyer's argument is foreclosed by *Bauer*, where the district court gave a nearly identical good-faith instruction, and we held that the instruction "muddied the water," but did not sufficiently distinguish "the binding nature of *Anderson*." *Id.* at 532–33.

Second, Campbell argues that the deliberate-ignorance instruction here is unique because it states: "If you are convinced that the defendant deliberately ignored a high probability that the controlled substances were being dispensed or distributed outside the course of professional practice and not for a legitimate medical purpose *or that patients were diverting these controlled substances for illegal purposes*, then you may find that he knew this was the case." R. 507, PID 11028–29 (emphasis added). Campbell asserts that this language effectively "equate[s]" patient diversion with a lack of authorization, such that the jury could "convict if [it] found that

---

**[2]**Although our precedent compels us to affirm, we once again note that "these are not the instructions that should be used in unauthorized distribution cases going forward." *Bauer*, 82 F.4th at 533.

Dr. Campbell deliberately ignored a high probability of patients diverting controlled substances for illegal purposes." Campbell Reply at 6.

Campbell attaches more significance to this language than warranted. The district court did not "equate" lack of authorization with patient diversion, and it did not state that deliberate ignorance of patient diversion satisfies an element of any crime. Rather, the district court simply instructed the jury that it could infer knowledge of patient diversion from Defendants' deliberate ignorance of a high probability of such diversion. Although Campbell is correct that the deliberate-ignorance instruction in *Anderson* did not contain similar language, this distinction does not make *Anderson* less controlling here. Just as in *Anderson*, the district court here discussed deliberate ignorance of a lack of authorization, and "juxtapose[d] . . . 'knowledge' with '[c]arelessness, negligence, or foolishness.'" *Anderson*, 67 F.4th at 766. The instructions here thus retain the core attributes this court has held "cover[] the holding of *Ruan*." *Id.*

Third, Dyer argues that "*Anderson* involved more severe conduct." Dyer Reply at 11. But that is irrelevant to whether the jury instructions were legally erroneous. The issue here is whether the district court's jury instructions "comport with *Ruan*," as interpreted by this court's precedents. *Bauer*, 82 F.4th at 532 (quotation omitted). That issue does not turn on the conduct of any particular defendant in any particular case.

Finally, Campbell argues that deliberate-ignorance instructions should be categorically barred in prosecutions under the Controlled Substances Act. As Campbell sees it, district courts use the instruction too "indiscriminately," so it should be taken off the table altogether. Campbell Brief at 25. That argument exceeds the bounds of this appeal. As we have explained, this court has repeatedly held that deliberate-ignorance instructions are proper in unlawful-distribution cases. *See, e.g.*, *Stanton*, 103 F.4th 1204, 1212–13; *Anderson*, 67 F.4th at 766.

## B. Sufficiency-of-Evidence Issues

Defendants argue that the government presented insufficient evidence to support their convictions. This court reviews sufficiency-of-evidence challenges de novo. *Bauer*, 82 F.4th at 528–29. A conviction rests on sufficient evidence if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.

307, 319 (1979).  In conducting this inquiry, this court considers all evidence "in the light most favorable to the prosecution."  *Bauer*, 82 F.4th at 528–29.

### 1.  Conspiracy to Unlawfully Distribute

Defendants first challenge their convictions of conspiracy to unlawfully distribute under 21 U.S.C. § 846.  To convict a defendant of this crime, the government must prove beyond a reasonable doubt: (1) "an agreement to violate drug laws," (2) "knowledge and intent to join the conspiracy," and (3) "participation in the conspiracy."  *United States v. Hall*, 20 F.4th 1085, 1106 (6th Cir. 2022) (citation omitted).  To meet this burden, the government need not present "direct" evidence of an agreement; all that is required is "circumstantial evidence" that would allow a jury to "infer[]" a "common plan."  *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012).  Defendants argue that the government presented insufficient evidence of agreement and participation.  We disagree.  The government provided sufficient evidence of an agreement between Campbell and Dyer to unlawfully distribute controlled substances, their knowledge and intent to join the conspiracy, and their participation in it.

One PPC employee testified that Campbell was the "decider" at PPC and the nurse practitioners—including Dyer—did what Campbell instructed.  R. 298, PID 3670.  Dyer—who had limited prescribing privileges under Kentucky law—sent prescriptions across the Indiana border for Campbell to sign.  Dyer refused to show his charts to PPC doctors other than Campbell.  The government's experts testified that Defendants' mutual prescribing practices were often without a legitimate medical purpose in the usual course of their professional practice.  PPC employees testified that Campbell left pre-signed prescriptions for nurse practitioners to hand out, prescribed opioids to patients without reviewing their medical charts, and prescribed opioids to patients who had failed drug tests.  And Dyer prescribed opioids after examining patients for five minutes or less.  The jury also heard testimony that PPC's parking lot and waiting area were often overcrowded and that many patients travelled great distances to reach the clinic.  This court has affirmed identical convictions based on similar evidence.  *See, e.g.*, *Stanton*, 103 F.4th at 1210–11 ("pre-printed" prescriptions after examinations that lasted "only a few minutes," "patients traveling long distances from out of state," and "prescriptions to patients who failed drug screens"); *United States v. Elliott*, 876 F.3d 855, 863–64 (6th Cir. 2017)

(patients traveling far distances to obtain opioid prescriptions and opioid-seeking patients crowding the parking lot).

Campbell and Dyer respond by noting that the government's experts at trial focused on five patients—four of whom were named in the indictment under the unlawful-distribution counts of which Defendants were acquitted. Thus, Defendants argue, the jury's guilty verdict on the conspiracy count must have been based solely on a conspiracy to unlawfully distribute to the one patient on which the government's experts focused who was *not* named in the indictment. Pointing to our holding that a § 846 conspiracy must "involve more than an agreement to transfer drugs from one party to another," *United States v. Wheat*, 988 F.3d 299, 308–09 (6th Cir. 2021), Defendants argue that the jury had insufficient evidence to convict on the conspiracy count.

This argument is unpersuasive. Even assuming the acquittals on the § 841 counts mean that this court must disregard the patients named in those counts, there was ample evidence to convict Defendants of conspiracy to unlawfully distribute. Although the government's experts focused their testimony on five named patients, the jury heard about countless other patients who received opioids from Campbell and Dyer. For example, Dyer saw up to fifty patients every morning, and prescribed opioids to more than 90% of them. Campbell signed many of the scripts Dyer gave to those patients, and there was testimony that Campbell prescribed opioids to other patients who had failed drug tests. At most, the acquittals on the § 841 counts mean that the jury found reasonable doubt as to whether Defendants unlawfully distributed to the four specific patients named in those counts. But the jury could still reasonably find that Defendants conspired to unlawfully distribute to other patients on other occasions.

Further, even if this verdict were legally inconsistent, that would not be a basis for reversal. When examining the sufficiency of evidence on a particular count, courts ask "whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt" as to that count. *United States v. Powell*, 469 U.S. 57, 67 (1984). That analysis "should be independent of the jury's determination that evidence on another count was insufficient." *Id.* Simply put, it is impossible to know *why* a jury renders a legally inconsistent verdict. The argument that an acquittal on one count means there was insufficient evidence on another "necessarily assumes that the acquittal . . . was proper" while the conviction was

improper.  *Id.* at 68.  But it is just as possible that the acquittal arose "through mistake, compromise, or lenity."  *Id.* at 65.  Where the acquittal is mistaken, "the Government has no recourse if it wishes to correct the jury's error"—it cannot, for example, re-prosecute a defendant on the assumption that the jury mistakenly acquitted.  *Id.*  Thus, a defendant has no recourse based on the assumption that the error ran in the other direction.  *Id.*

Resisting that conclusion, Defendants point to *United States v. Randolph*, in which this court reversed based on "inconsistency" in the jury's findings.  794 F.3d 602, 611–12 (6th Cir. 2015).  But that case involved "an internal inconsistency in the same count"—namely, the jury convicted the defendant of conspiring to distribute illegal drugs, but stated on the verdict form that the amount of drugs involved was "none."  *Id.* at 608, 611.  *Randolph* held that this single-count inconsistency was "different" from inconsistency across "separate counts charg[ing] separate crimes in a single indictment."  *Id.* at 609–11.  The latter inconsistency is not a basis for reversal.  *See, e.g.*, *Powell*, 469 U.S. at 67; *United States v. Lawrence*, 555 F.3d 254, 261 (6th Cir. 2009).

In sum, there was sufficient evidence to support Defendants' convictions of conspiracy to unlawfully distribute controlled substances.

### 2.  Health-Care Fraud and Conspiracy to Commit Health-Care Fraud

Defendants argue that there was insufficient evidence to support their convictions of health-care fraud and conspiracy to commit health-care fraud under 18 U.S.C. §§ 347, 349.  To prove health-care fraud, the government must prove beyond a reasonable doubt that the defendant: (1) "knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services," (2) "executed or attempted to execute this scheme or artifice to defraud," and (3) "acted with intent to defraud."  *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017) (citation omitted).  To prove a conspiracy to commit health-care fraud, the government must prove beyond a reasonable doubt: (1) "an agreement" to commit health-care fraud, (2) "knowledge and intent to join the conspiracy," and (3) "an overt act constituting actual participation in the conspiracy."  *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).

At trial, the government proved these counts by presenting evidence that Defendants fraudulently billed insurers for certain exercise, counseling, and physical-therapy services. The evidence established that Campbell created an exercise program at PPC called "MedFit." R. 292, PID 3125. MedFit was a "small gym set up at the clinic." *Id.* That gym had a "treadmill," "bike," "elliptical," and "weights." R. 305, PID 3916. A patient participating in MedFit would visit PPC, spend a "few minutes" with a provider while that provider checked vitals, and then exercise at the gym. R. 305, PID 3916–18; R. 298, PID 3570–71. These workouts were largely supervised by PPC employee Mark Brandenburg, who was neither a doctor nor a health-care professional of any kind; rather, he was Campbell's "pool guy." R. 305, PID 3916. PPC billed insurance companies for MedFit using the 99214 billing code. That billing code is permitted only for medical appointments that involve a detailed review of the patient's medical history, a detailed exam, and comprehensive medical decision-making.

Similarly, PPC used the 99214 code to bill insurers for PPC's physical-therapy and counseling services. PPC's medical providers had no involvement in these services—except that when a patient visited for counseling or physical therapy, a doctor or nurse practitioner would spend a few minutes checking the patient's vitals. The physical-therapy service was supervised by someone who was not a licensed physical therapist.

Defendants' primary argument is that their billing practices were actually *legal*. Defendants rely on a practice called "incident-to" billing, under which a provider can bill using the 99214 code for services provided by "mid-level practitioners" who are not doctors. Campbell Brief at 39. But the government presented evidence that Defendants' services would not qualify for incident-to billing. For example, two insurers Defendants billed—Medicare and Indiana Medicaid—permit incident-to billing only for services that are monitored and supervised by a doctor according to a doctor-created plan of care. A reasonable jury could thus conclude that Defendants' services did not meet those criteria because MedFit involved almost no interaction with any doctor. Further, the jury heard evidence that another insurer billed by

PPC—Kentucky Medicaid—did not permit incident-to billing "under any circumstances." R. 277, PID 2201.**3**

Defendants also argue there was insufficient evidence that they acted with an intent to defraud. That argument, too, is unpersuasive. In PPC's Medicare enrollment agreement, Campbell accepted responsibility for complying with Medicare regulations. And Dyer testified that he understood the requirements for 99214 billing. From this evidence, a jury could reasonably infer that Campbell and Dyer understood the requirements for the billing code they used and acted with an intent to defraud insurers by billing for services that did not meet those requirements. *See, e.g.*, *Anderson*, 67 F.4th at 770–71 (sufficient evidence of intent to defraud where defendant doctor "sign[ed] a provider agreement in which he agreed to render services in accordance with federal law").

### 3. Money Laundering

Defendants argue that the evidence at trial was insufficient to support their convictions for conspiring to launder money under 18 U.S.C. § 1956. To prove this crime, the government must show that the defendant: (1) knowingly and voluntarily joined an agreement to conduct a financial transaction from the proceeds of illegal activity, (2) knew the money came from illegal activity, and (3) intended to promote that activity. *United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020). The government alleged that Defendants conspired to launder money by using the insurance proceeds from PPC's fraudulent billing scheme to pay employees like Dyer hefty bonuses, which incentivized further fraudulent billing and other unnecessary testing.

---

**3**Campbell also argues that the indictment was insufficient because it did not mention "incident-to" billing. An indictment must charge every element of a criminal offense. *See, e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). It must also be "specific enough to allow [the defendant] to plead an acquittal or conviction as a bar to future prosecutions for the same offense." *United States v. Olive*, 804 F.3d 747, 752 (6th Cir. 2015). Here, the third superseding indictment was specific about the government's health-care-fraud allegations. It stated that Defendants "fraudulently billed various health care benefit programs by coding physical therapy, counseling, and exercise . . . services using evaluation and management codes in order to obtain a higher rate of reimbursement." R. 110, PID 433–35. Defendants responded to that allegation at trial by claiming that they could bill for those services using "incident-to" billing. The government responded in turn by calling an expert who established that Defendants' services likely could not be billed as "incident-to." This latter assertion was not mentioned in the indictment because it was a response to Defendants' trial theory. Campbell has not explained why this makes the indictment insufficient.

Defendants' primary argument is that there was insufficient evidence of money laundering because there was insufficient evidence of health-care fraud—as they see it, this case does not involve the "proceeds of illegal activity" to begin with. Campbell Brief at 45. This argument is unpersuasive because there was sufficient evidence of health-care fraud.

Beyond that, Dyer argues that there was insufficient evidence to show that he knew his bonus payments were the proceeds of health-care fraud. But the jury heard evidence that Dyer signed billing sheets marked with the 99214 code, even though he knew the services provided were insufficient for that code. Accordingly, a jury could reasonably find that Dyer knew PPC was profiting from unlawful billing, and that those profits were used to pay PPC's expenses, including bonuses.

## C. The District Court's Evidentiary Rulings

Dyer next argues that his conviction should be reversed based on evidentiary errors at trial. Campbell adopts these arguments in his Rule 28(i) Letter. This court generally reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Dietz*, 577 F.3d 672, 688 (6th Cir. 2009). But when the objection is raised "for the first time on appeal," this court reviews for plain error. *United States v. Knowles*, 623 F.3d 381, 385 (6th Cir. 2010) (collecting cases).

### 1. The Testimony of Experts Denham and King

Defendants argue that the district court erred in admitting the testimony of two government experts, Denham and King. We review for abuse of discretion because Defendants preserved this objection below.

Defendants primarily argue that the district court should not have permitted Denham and King to testify to general medical standards of care. For example, the government asked Denham and King to testify to what "should have happened" if proper medical protocol was followed. R. 284, PID 2524. In Defendants' view, this testimony "set forth [a] lesser civil standard of care" by suggesting that Campbell and Dyer could be convicted for mere malpractice. Dyer Brief at 28.

We disagree. The government can prove knowledge of a lack of authorization "by reference to objective criteria," such as "objective standard[s] [of] medicine" and "accepted limits" of medical practice. *Ruan*, 597 U.S. at 467 (quotations omitted). Indeed, it is "impossible" for the government to prove that a defendant was "acting outside the usual course of professional practice . . . without mentioning the usual standard of care." *United States v. Volkman*, 736 F.3d 1013, 1023 (6th Cir. 2013) (quotations omitted), *vacated on other grounds*, 574 U.S. 955 (2014).

Defendants next argue that the district court abused its discretion in allowing Denham and King to discuss the 2016 CDC guidelines because the offenses occurred between 2010 and 2014. Given the timeline mismatch, these guidelines seem to have very little probative value here. But Defendants have not shown that this discussion of the 2016 guidelines caused any harm. In response to an objection from defense counsel, the government elicited testimony from both experts to clarify that the guidelines were published after the offense conduct. And both experts told the jury that they did not rely on the guidelines in forming their opinions. Defendants argue that the experts borrowed from the 2016 guidelines the phrase "start low, go slow"—a now-common phrase meant to signify that doctors should be cautious when prescribing opiates. Dyer Brief at 30. But King explained that this was a "general principle of medicine," and "not something that has just newly come about." R. 296, PID 3441. Overall, any testimony on these guidelines was a "minor point" that caused no harm and does not justify reversal. *United States v. Maliszewski*, 161 F.3d 992, 1008 (6th Cir. 1998).

### 2.  The Government's Summary Bar Graph

Defendants argue that the district court erred in admitting a summary bar graph the government created that compares Dyer's bonus earnings to those of other PPC employees. Defendants argue on appeal that the graph should have been excluded under Federal Rules of Evidence 403 and 1006.  At trial, Defendants objected that the graph was cumulative and not relevant.  Because the arguments raised on appeal were not raised at trial, we review for plain error.  *Knowles*, 623 F.3d at 385.

Defendants argue that the graph is unfairly prejudicial under Rule 403 and inadmissible under Rule 1006 because it lacks "context"—they say that Dyer earned higher bonuses for legitimate reasons, e.g., he worked longer hours and had more experience.  Dyer Brief at 32–33. But Defendants do not dispute that the graph is accurate.  They do not, for example, argue that Dyer made *less* in bonuses than the graph lists.  What is disputed here is *why* Dyer's bonuses were so high, and both parties had the opportunity to present evidence and argument to the jury on that issue.  On that point, the chart is agnostic—as it should be.  A summary chart cannot be "annotated with the conclusions . . . or inferences drawn by the proponent."  *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998).  On its face, this chart simply conveyed factual data "accurately" and "correctly," *id.*, which means its "probative value was not substantially outweighed by any risk of unfair prejudice," *United States v. Weinstock*, 153 F.3d 272, 278 (6th Cir. 1998).

### 3.  The Testimony of DEA Investigator Jason Smith

Defendants next argue that the district court erred in admitting the testimony of DEA Investigator Jason Smith.  Defendants raised this objection below, so we review for abuse of discretion.  Smith testified about "red flags" typically associated with criminal activity in opioid prescribing.  R. 487, PID 9352–71.  Defendants argue that this testimony required "specialized knowledge" and thus could only be "offered by an expert."  Dyer Brief at 34.

Defendants' argument seems to rest on the assumption that a law-enforcement officer cannot give expert testimony unless the government formally offers him as an expert at trial, and

the district court formally deems him to be one.**⁴**  That is not correct.  A trial court "does not 'certify' or declare witnesses to be 'experts' when 'tendered' as such at trial." *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007) (citation omitted).  Indeed, a trial judge should "refrain from declaring before the jury that a law enforcement officer is considered an expert," *United States v. Neeley*, 308 F. App'x. 870, 876 (6th Cir. 2009), because doing so "lends a note of approval to the witness that inordinately enhances the witness's stature," *Johnson*, 488 F.3d at 697.  Instead, the government "should pose qualifying and foundational questions" and then "proceed to elicit opinion testimony." *Id.* at 698.  At any point, the defendant is free to object and argue that the expert is not qualified to give the opinion testimony he is offering.  *Id.*

Defense counsel raised such an objection here, and the trial judge overruled it because Smith "established that he's done these types of investigations," and that he's had "training in diversion." R. 487, 9356–57.  That conclusion was not an abuse of discretion.  Indeed, this court has held that an officer with similar experience was qualified to testify about "the characteristics of a typical pill mill." *United States v. Gowder*, 841 F. App'x 770, 781 (6th Cir. 2020).

### 4.  The Testimony of PPC Employee Dawn Antle

Finally, Defendants argue that the district court erred in admitting certain testimony from Dawn Antle, a former PPC employee.  Antle testified that PPC prescribed "a lot" of narcotics. R. 298, PID 3564.  Defendants argue that this is a "qualitative assessment" that a lay witness like Antle cannot provide.  Dyer Brief at 36.  Defendants raised this objection below, so we review for abuse of discretion.

In full context, the government's trial counsel asked: "from the patient charts that you reviewed, what percentage of [PPC] patients were on narcotics?"  R. 298, PID 3564.  Antle responded, "I'd say a good 90 percent. A lot." *Id.*  Counsel then asked, "based on the patients you saw and the patient files that you saw . . . from your personal knowledge, what was the . . . overall assessment of narcotic prescribing based on what you saw?" *Id.* at 3565.  Antle responded, "[t]here were a lot of narcotics. A lot of high-dose narcotics." *Id.*

---

**⁴**The government identified Smith as an expert witness before trial.

Antle's first answer was purely factual and was "rationally based on [her] perception." Fed. R. Evid. 701. Although her second answer included a more qualitative assessment, any error in admitting that answer was harmless and cumulative of other evidence showing that Campbell and Dyer prescribed opioids in ways well outside of professional norms. *See infra* Part B.1.

## D. Sentencing and Restitution Issues

### 1. Drug Quantity Calculation

Dyer argues that the district court wrongly calculated "drug quantity" in determining his sentence. Dyer Brief at 47–49. The Sentencing Guidelines require a sentencing judge to calculate the quantity of drugs for which a defendant is responsible in determining the defendant's base offense level. U.S.S.G. § 2D1.1. "[A]n estimate will suffice," if supported by a preponderance of the evidence. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (quotation omitted). A district court should not punish a defendant based on an estimate that is "greater than" the quantity for which he is "*actually* responsible." *Id.* (quotation omitted). Because this calculation is a factual finding, this court reviews it for clear error. *Id.*

Here, the district court calculated Dyer's drug quantity by using the weight of drugs prescribed to seven patients. Dyer argues that there was insufficient evidence to "show these seven prescriptions were unlawful." Dyer Brief at 48. But three separate experts agreed that the prescriptions listed in those patient files had no legitimate medical purpose and were outside the usual course of Dyer's professional practice. Dyer responds that his own experts contradicted the government's. But the district court was entitled to credit the government's experts over those of the defense. *See, e.g.*, *United States v. Mosley*, 53 F.4th 947, 962 (6th Cir. 2022) ("we afford great weight to the district court's credibility determinations" in calculating drug quantity).

Of course, where there is conflicting testimony as to drug quantity, the trial court should "err on the side of caution." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). But the district court did so. The district court selected seven patient files out of "thousands and thousands and thousands of files" involved in a "seven-year conspiracy." R. 428, PID 7503.

Then, to offset the possibility that any of the prescriptions within the files might be legitimate, the district court reduced its calculation by one-third. *Id.* at 7505. And the district court refused to consider any of the patients named in the indictment's acquitted counts. *Id.* It is thus highly unlikely that the district court punished Dyer for a drug quantity "greater" than the quantity for which he was "*actually* responsible." *Jeross*, 521 F.3d at 570. The district court's calculation was supported by a preponderance of the evidence.

### 2. Use of Intended Loss Instead of Actual Loss

Defendants argue that the district court erred in using the "intended loss" of Defendants' crimes to calculate their sentence. The Sentencing Guidelines direct a district court to increase a defendant's offense level based on the amount of "loss" the defendant caused. U.S.S.G. § 2B1.1(b). In its commentary on the Guidelines, the Sentencing Commission explained that "loss" means "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). But this court defers to Guidelines commentary only where the text of the Guideline itself is "genuinely ambiguous" after exhausting "all the traditional tools of statutory construction." *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019)). Defendants argue that the Guidelines are not ambiguous—as they see it, "loss" can only mean "actual loss," not "intended loss." Dyer Brief at 51–52; Campbell Brief at 50.

Our precedent forecloses this argument. In *You*, this court held that the Guidelines are sufficiently ambiguous to permit considering the commentary, so a district court may properly consider intended loss. 74 F.4th at 397–98. Thus, the district court did not err.

### 3. The Intended-Loss Calculation

Defendants also appeal the district court's calculation of intended loss. The district court calculated Defendants' intended loss by summing all insurance claims Defendants submitted between January 2012 and December 2014 for the exercise, counselling, and physical-therapy services related to the health-care-fraud counts. Under that metric, the district court found that Campbell was responsible for $3.9 million in intended loss and Dyer was responsible for $601,467.

Defendants argue that the district court used an unreliable data set, failed to account for their knowledge of common insurance-reimbursement practices, and failed to credit the value of services rendered. Accounting for these alleged errors, Campbell argues that his loss should have been calculated at around $437,000. Dyer argues his loss should have been calculated at $100,000.

We need not resolve these objections because any error in the intended-loss calculation was harmless. When a district court "misapplie[s] the Guidelines," we may still affirm if "the error did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992). In deciding whether a Guidelines error is harmless, we examine how the district court's "application of an incorrect[] higher Guidelines range" affected "the sentence [the defendant] received." *Molina-Martinez v. United States*, 578 U.S. 189, 201 (2016). We also consider "relevant statements by the judge" to determine whether "the district court thought the sentence it chose was appropriate irrespective of the Guidelines range." *Id.* A Guideline-calculation error is harmless where the district court states it "would impose the same sentence" regardless of the error, *United States v. Obi*, 542 F.3d 148, 156 (6th Cir. 2008), and explains how "proper use of the [18 U.S.C.] § 3553(a) factors" "independently supports" the sentence, *United States v. O'Georgia*, 569 F.3d 281, 288 (6th Cir. 2009).

Here, any error in the intended-loss calculation did not affect Defendants' sentences. Applying the intended-loss figures Defendants challenge, the district court determined that Campbell's Guidelines range was 210–262 months, and Dyer's was 97–121 months. But the court found that the sentencing factors under 18 U.S.C. § 3553(a) required a sentence well outside the Guidelines range: 105 months for Campbell and sixty months for Dyer. As the district court saw it, these sentences were long enough to provide "just punishment" and reflect the Defendant's "very serious" crimes. R. 428, PID 7557–58, 7565. And they also aligned with "other sentences given out in similar cases" and accounted for the fact that Defendants were not "candidate[s] for recidivism" and had strong "family ties." *Id.* at 7559, 7562, 7565. The court thus concluded that "consider[ing] the [18 U.S.C. §] 3553 factors as a whole," it "would have sentenced [Defendants] the same regardless" of Defendants' "objections to the guideline range." *Id.* at 7562, 7567.

Further, if the district court had adopted Defendants' intended-loss calculations, Campbell's Guidelines range would have been 121–151 months, and Dyer's Guidelines range would have been 87–108 months. *See* U.S.S.G. §§ 2B1.1, 3D1.4. But the sentences the district court imposed fall well below even these more favorable Guidelines ranges. In sum, the record makes clear that any error in the intended-loss calculation "did not affect the district court's selection of the sentence imposed." *Williams*, 503 U.S. at 203.

### 4. Restitution

Defendants also argue that the district court erred in calculating restitution. That argument is beyond the scope of this appeal. *See Manrique v. United States*, 581 U.S. 116 (2017). A district court may sometimes enter an initial judgment "imposing certain aspects of a defendant's sentence" while "deferring a determination of the amount of restitution until entry of a later, amended judgment." *Id.* at 118. In those cases, a defendant must file a notice of appeal as to the restitution "following the amended judgment." *Id.* If the defendant files only "a single notice of appeal" "between the initial judgment and the amended judgment," then the "later-determined restitution amount" is outside the scope of the appeal. *Id.* This requirement is a mandatory claims-processing rule, so when the government timely raises the issue, this court has no "discretion to overlook" the error. *Id.* at 125.

Here, the district court initially entered judgment on April 21, 2023, and stated that restitution would "be determined by further order[]." R. 420, PID 7347; R.421, PID 7355. Defendants then appealed. Nearly nine months later, on January 10, 2024, the district court entered its restitution order. But Defendants did not file an additional notice of appeal. They have thus failed to "invoke appellate review of the later-determined restitution amount." *Manrique*, 581 U.S. at 118. And because the government has timely raised the issue, this court cannot consider Defendants' objections to the restitution order. *Id.* at 125.

### III. Conclusion

For the foregoing reasons, we affirm Defendants' convictions and sentences.